OZARK NATURAL GAS COMPANY *v.* MOORE.

4-6074 144 S. W. 2d 35

Opinion delivered November 4, 1940.

*Jeta Taylor* and *Daily & Woods,* for appellants.

*J. Bun Perrymore, Jonah E. Yates, Partain & Agee* and *Geo. W. Johnson,* for appellees.

GRIFFIN SMITH, C. J. The appeal is by Fred Wilson and Ozark Natural Gas Company from judgments aggregating $20,000, as shown in the footnote.[1] Action of Wilson in stopping a truck in such manner as to obstruct the view of the driver of an automobile in which Williams' intestate and others were passengers is gravamen of the complaint. It is alleged that Wilson was a servant of Ozark Natural Gas Company.

Fleeman Norman, driving his 1929 model "A" coupe, collided with a Ford V-8 driven by an unidentified party. Gertrude Williams received injuries from which she died several weeks later.

Norman had been transporting workers to fields near Lavaca. Just before the collision ten persons were in and on the car—four in the rumble seat, one on each running board, and three with the driver in the front seat.

Highway 22[2] from Fort Smith to Charleston is intersected by highway 96.[3] At the area of intersection general direction of highway 22 is northwest and southeast.[4] Beginning at a point in the center of highway 22 and proceeding south 135 feet, highway 96 is there shown by a plat to be 29½ feet wide, and on the right

[1] "We, the jury, find . . . for Carrie Moore, $5,000; for Ben J. Williams, administrator, for the benefit of the estate of Gertrude Williams, deceased, $10,000; for Ben J. Williams, administrator, for the benefit of Ben J. Williams, $1,500; for Ila Williams, $1,500; for Ruth Burkett, $2,000."

[2] No. 22 is concrete, 18 feet wide.

[3] No. 96 is gravel, somewhat wider than 22, with ample "shoulders." It leads from Greenwood to Lavaca, and beyond.

[4] Inasmuch as testimony refers to highway 22 as extending east and west, and to 96 as traversing north-south, these directions will be assumed for the purpose of this opinion.

in a conspicuous place is an official highway "stop" sign. North from this sign the gravel road gradually widens until at the south margin of highway 22 there is, as Norman expressed it, sufficient space for six or seven cars abreast. This "flare" construction is to facilitate traffic. The plan extends to each side of highway 22.

Norman, traveling north on highway 96 with his nine passengers, stopped when eight to twelve feet south of highway 22, where three got out and others shifted positions. While the coupe was thus stopped near the center of highway 96, Wilson drove up in his truck, to which was attached a trailer loaded with 5-inch well casing. Just where Wilson stopped is not definitely shown, but from plaintiffs' witnesses (statements of whom are shown in the fifth footnote)[5] there is no contention that the truck wheels were more than a few inches on the concrete—although the term "inches" is not used. Indeed, the inference to be drawn from all declarations is that the tires were away from, or at most only touching, the south side of the paving.

Relieved of the three passengers, Norman says he looked up and down highway 22 the best he could, then started across the paving in low gear, making perhaps fifteen miles an hour. The truck had not moved when he started, and it was ten feet to his right. It was impossible to see over the iron pipe on the trailer, nor could he see around the truck or over the cab. Although the view, generally, was thus obstructed except for a distance of about twenty feet on Wilson's side, Norman says he could see between the pipe and the cab 100 to 110 yards east to the top of a hill. In the glance he

---

[5] Ila Williams testified that ". . . a truck pulled up and stopped on the edge of the highway." On cross-examination she said: "The truck pulled on to the concrete or pretty close to it before it stopped." Again, she said: "Front wheels of the truck were pretty close to the concrete, or maybe on it."

Carrie Moore testified: "The truck stopped near the pavement of highway 22."

Ruth Burkett testified: "A big truck came up and passed [us] on the right and stopped, and blocked [our] view of the highway." On cross-examination she said: "The truck stopped even with [us] and stayed there, and was still standing there when [we] started up." Again, she testified: "While [our] car and the truck were standing at the intersection there was ten or twelve feet of intervening space between [us]—the length of a small car."

cast in that direction no car was visible. After having cleared the median line of highway 22 and almost reaching safety to the north, a Ford V-8 from the east traveling 35 or 40 miles an hour struck Norman's car near the rear. At that time he had gone north 26 to 30 feet from starting point. From the time he saw the V-8 until it struck his car, Norman covered less than two feet. Instead of trying to slow down, or stop, he "stepped on the accelerator" and "almost made it."

In the meantime Wilson's truck had turned to the right on highway 22. When the wreck occurred Wilson stopped and gave assistance, then hurriedly drove to Charleston to direct an ambulance for relief of the injured.

From testimony given by the plaintiffs it appears that Wilson's only connection with the collision was his conduct in observing directions of the traffic sign. Section 6717, par. (b) of Pope's Digest is: "The driver of a vehicle may overtake and, allowing sufficient clearance, pass another vehicle proceeding in the same direction either upon the left or upon the right on a roadway with unobstructed pavement of sufficient width for four or more lines of moving traffic when such movement can be made in safety."

In the case at bar there must have been sufficient clearance for Wilson to pass to Norman's right, for Norman testified there was a ten-foot space between them. The gravel surfacing of highway 96 was wide enough for four or more lines of moving traffic. This will be conclusively presumed from Norman's statement that there was room for six or seven cars. Hence, § 6717 par. (b) was not violated.

Section 6722, par. (a) of Pope's Digest directs that "the driver of a vehicle intending to turn at an intersection shall do so as follows: Both the approach for a right turn and a right turn shall be made as close as practical to the right-hand curb or edge of the roadway."

Norman was near the center of highway 96, and Wilson approached highway 22 (where he intended to turn)

by keeping "to the right-hand curb or edge of the roadway." Wilson did not violate this provision.

In respect of Norman's conduct, § 6730, par. (b) of Pope's Digest is cited. It provides:

"The driver of a vehicle shall likewise stop in obedience to a stop sign as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway *and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard,* but may then proceed." [6]

There was no stop sign on highway 22. The Ford V-8, therefore, had the right-of-way. Yet, with a clear vision of only 20 feet to the east, Norman, without protest from any of the appellants whose duty it was to warn him if his actions were negligent, indifferently drove into a place of peril. Some of the questions asked Norman on cross-examination, and his answers, are shown in the seventh footnote.[7]

There is not, in the entire record, a scintilla of evidence—not a fact, a circumstance, or an inference—upon which to predicate negligence by Wilson. Even the vacuous substance of "such stuff as dreams are made on" is utterly lacking.

---

[6] Italics supplied.

[7] Q. You started across highway 22 at a time when you only had a 20-foot vision clear to you? A. Down east. Q. You couldn't see but 20 feet to the east on the highway, yet you started across it? A. Yes, sir. Q. You didn't throw on your brakes? A. No, sir. Q. That was the thing you didn't do? A. Yes, sir. I never thought about the brakes until I was too far out in there, and— Q. Did it occur to you that maybe the truck had stopped to wait for traffic to get by? A. I never thought anything about it. Q. Did you holler and ask the driver of the truck if there was anyone coming? A. I didn't think that was any of my business. Q. It didn't occur to you that maybe he had a reason for standing there waiting? A. No, sir. I didn't figure anything about that. Q. You waited until you got ready to start across, knowing that you just had a 20-foot vision, according to your statement, and you drove on across there without knowing whether or not there was any traffic coming, did you? A. I was pretty sure there was no traffic coming. I could see through that place [between the cab and the trailer] and didn't see no glimpse of a car passing through there. Q. You decided to take a chance on it when you didn't see any car through that crack? A. I thought I could go across. Q. You got nearly across before you saw the car? A. I like to have made it and—."

It follows that the judgment must be reversed, and the cause dismissed.